**V I R G I N I A :**

## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA ALEXANDRIA DIVISION

| | |
|---|---|
| **MPA TRANSPORTATION, INC.**<br>c/o Fox & Moghul<br>10509 Judicial Drive, Suite 300<br>Fairfax, Virginia 22030<br><br><br>*Plaintiff,*<br><br><br>v.<br><br><br>**BLS-USA, INC.,**<br>Richard M. Howard, Esq.<br>c/o Meltzer, Lippe, Goldstein & Breitstone,<br>LLP<br>190 Willis Avenue Mineola<br>New York 11501<br><br>and<br><br>33 Queens Street Suite 100<br>Syosset, NY 11791<br><br><br>*Defendant.* | Case No.: _____ |

## COMPLAINT

COMES NOW Plaintiff MPA Transportation, Inc., by counsel, and for its Complaint against Defendants BLS-USA, Inc. and states as follows:

## PARTIES

1.  Plaintiff MPA Transportation, Inc. ("MPA") is a Virginia corporation with its principal place of business at 13635 Beckingham Drive, Herndon, Virginia 20171.

1

2. Defendant BLS-USA, Inc. ("BLS") is a New York corporation with its principal place of business at 18-20 Steinway Street, Astoria, New York 11105.

## JURISDICTION AND VENUE

3. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a). Complete diversity exists because MPA is a citizen of Virginia and BLS is a citizen of New York, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

4. The Court has personal jurisdiction over BLS pursuant to Va. Code Ann. § 8.01-328.1 and the Due Process Clause because BLS purposefully transacted business in the Commonwealth of Virginia, contracted for transportation services to be supplied by MPA from Virginia, repeatedly dispatched reservations and service instructions to MPA in Virginia, accepted the benefit of transportation services coordinated and performed by MPA from its principal place of business in Virginia, and directed payment-related communications and obligations to MPA in Virginia. BLS's contacts with Virginia were continuous, deliberate, and directly related to the claims asserted in this action.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to MPA's claims occurred in the Eastern District of Virginia. Among other things, MPA is headquartered in this District; BLS dispatched reservations and service instructions to MPA in this District; MPA accepted, coordinated, and performed the services at issue from its principal place of business in this District; BLS's payment obligations were owed to MPA in this District; BLS directed payment assurances and other communications to MPA in this District; and MPA suffered financial and operational injury in this District as a result of BLS's failure to pay.

2

**NATURE OF ACTION**

6. BLS is a chauffeured ground transportation network that entered into a long-running affiliate-services relationship with MPA pursuant to a written rate schedule issued by BLS and the parties' nearly decade-long course of performance. Under that relationship, MPA performed affiliate transportation services for reservations dispatched by BLS, and BLS was obligated to compensate MPA according to the rates and payment practices established by the parties' Agreement. BLS's prolonged refusal to pay MPA $85,215.56 in earned compensation constitutes a material breach of that Agreement and has caused MPA direct damages in the unpaid balance and consequential damages including the forced sale of revenue-generating vehicles, the involuntary termination of four employees, and the broader destruction of MPA's business operations.

7. BLS further continued to dispatch reservations while promising that payment would be made promptly, despite knowing that it could not make the promised payments when due. BLS's senior officers repeatedly assured MPA that payment was forthcoming, represented that funds would be available imminently, and promised to wire payments to MPA, even though BLS knew that it lacked the present ability to honor those promises. MPA continued performing reservations for BLS in reliance on those representations. To date, a significant portion of the balance owed to MPA remains unpaid. BLS's willful misrepresentations and continued deception elevate this matter beyond breach of contract and render BLS liable for fraud or, alternatively, constructive fraud.

**FACTS**

8. BLS operates a chauffeured ground transportation network company. BLS receives trip reservations from corporate and individual clients and dispatches, or "farms out," those

3

reservations to local affiliate operators who perform the actual transportation services using their own vehicles, drivers, fuel, and insurance.

9. MPA is a limousine and ground transportation company that has operated continuously in the Commonwealth of Virginia since at least 2016, providing affiliate transportation services to national and regional ground transportation networks.

10. Since at least 2016, MPA has worked with BLS as an affiliate operator within BLS's ground transportation network.

11. The parties' commercial relationship is governed by a written rate schedule issued by BLS-USA, Inc, together with the parties' established and uninterrupted course of performance over nearly a decade (the "Agreement"). *See* Exhibit A.

12. Under the Agreement, for every completed reservation, BLS is obligated to pay MPA fifty percent (50%) of the vehicle hourly rate or flat airport rate that BLS charges its end-client, fifty percent (50%) of any parking fees, tolls, or airport fees collected, and one hundred percent (100%) of any gratuity collected.

13. The Agreement expressly requires that all payments "MUST be paid to the driver within seven (7) days of receipt of the payment for the transfer," with payments "made the 15th and the 30th of each month."

14. For nearly a decade, BLS performed under the Agreement and timely paid MPA for completed reservations in accordance with its terms.

15. MPA fully and faithfully performed its contractual and operational obligations under the Agreement.

4

16. At no point during the parties' nearly decade-long relationship has BLS raised any complaint, dispute, deficiency, chargeback, or quality concern regarding any service MPA provided.

17. Beginning in or around October 2025, BLS ceased paying MPA for completed reservations in accordance with the Agreement.

18. BLS continued to dispatch reservations to MPA throughout this period.

19. MPA continued to perform those reservations in reliance on BLS's payment obligations under the Agreement and BLS's repeated assurances that payment was forthcoming.

20. BLS' own Accounts Payable Aging Detail Report confirms an outstanding balance owed to MPA of $85,215.56 as of the date the report was generated, exclusive of amounts owed for services rendered in March 2026 and thereafter. *See* Exhibit B.

21. The Aging Detail Report is BLS's internal business record and constitutes BLS's admission of the debt owed and the amounts due to MPA under the Agreement.

22. Throughout the period of nonpayment, BLS's senior officers repeatedly assured MPA that payment was forthcoming.

23. In text messages and email communications spanning October 2025 through March 2026, BLS's President Michael Okon and BLS's Chief Financial Officer Kevin Hornik represented to MPA, among other things, that "money will be flowing in tomorrow" and that BLS would "wire you something tomorrow to start paying down your bill." *See* Exhibit C.

24. On March 13, 2026, Mr. Okon emailed MPA and admitted: "I'm so sorry . . . We had a cash flow problem. No one is lying. The intent is to pay you and we'll get you money next week." No payment followed. *See* Exhibit C.

5

25. On or about November 24, 2025, BLS issued a check to MPA in the amount of $5,096.39 that was returned for insufficient funds. *See* Exhibit D.

26. Mr. Okon has acknowledged that BLS is "dealing with a cash crunch" and is "selling . . . $20 million in real estate . . . to help pay the affiliate bills."

27. MPA's principal Vikas Sorot expressly warned BLS's Chief Financial Officer Kevin Hornik in writing of the existential threat BLS's nonpayment posed to MPA's business. Mr. Sorot expresses his concern in writing to Mr. Hornik that "this thing has been going on for a long time" and that BLS's prolonged nonpayment meant he was "sure I will go bankrupt soon." *See* Exhibit C.

28. BLS's prolonged nonpayment has caused MPA substantial and foreseeable injury beyond the unpaid principal balance.

29. MPA was forced to sell five revenue-generating vehicles integral to its BLS-related operations, including a 2022 Lexus ES350, a 2022 Mercedes Sprinter van, a 2022 Chevrolet Suburban, a 2023 Chevrolet Suburban, and a 2023 Cadillac Escalade, at distressed values, and was forced to involuntarily terminate four employees.

30. MPA has been unable to accept new assignments, has fallen behind on its own bills, mortgage, and insurance obligations, and has suffered reputational harm in the affiliate transportation industry.

31. BLS knew or should have known, at the formation of the Agreement and throughout its performance, that MPA's fleet, payroll, and daily operations depended on BLS's timely payment for completed trips and would experience financial difficulty as a result of non-payment.

6

32. On March 23, 2026, MPA transmitted a formal written demand to BLS identifying the past-due balance and affording BLS an opportunity to cure within ten days. BLS failed to make payment.

33. As a result of BLS' actions and omissions as detailed herein MPA has suffered and continues to suffer significant damages.

## COUNT I
## BREACH OF CONTRACT

34. MPA incorporates and realleges all of the foregoing allegations as if restated herein.

35. The Agreement constitutes a valid and enforceable contract between MPA and BLS.

36. The Agreement was formed and confirmed by BLS's issuance of the written rate schedule, MPA's acceptance through performance, and BLS's acceptance of the benefit of MPA's services over the parties' nearly decade-long course of dealing.

37. BLS's continued performance under the Agreement, including its dispatch of reservations to MPA, acceptance of completed services, payment of MPA according to the rate schedule, and internal recording of amounts owed to MPA, further demonstrates BLS's adoption and ratification of the Agreement.

38. The Agreement contains definite and certain material terms, including the services MPA would perform, the compensation BLS owed for completed reservations, and the timing of payment.

39. MPA performed its obligations under the Agreement.

40. BLS materially breached the Agreement by failing to pay MPA for completed reservations beginning in or around October 2025 and continuing through the present.

41. BLS's own Accounts Payable Aging Detail Report acknowledges an outstanding balance of $85,215.56 owed to MPA, exclusive of additional amounts owed for services rendered in March 2026 and thereafter.

42. As a direct and proximate result of BLS's breach, MPA has suffered direct damages in the principal amount of no less than $85,215.56, exclusive of additional amounts continuing to accrue.

43. BLS's nonpayment caused MPA consequential damages beyond the unpaid contract balance, including the forced sale of revenue-generating vehicles, the involuntary termination of employees, reduced capacity to accept additional transportation assignments, defaults or delinquencies on MPA's own financial obligations, and reputational harm in the affiliate transportation industry.

44. MPA's consequential damages arose from special circumstances known to BLS when the Agreement was formed and throughout the parties' course of performance.

45. Through the parties' nearly decade-long affiliate relationship, BLS knew or reasonably should have known that MPA depended on timely payment from BLS to maintain its fleet, meet payroll, maintain commercial insurance, service vehicle financing, and sustain the operations necessary to perform BLS-dispatched reservations.

46. MPA is therefore entitled to recover its direct and consequential damages, together with prejudgment interest on each past-due amount from its respective due date pursuant to Va. Code Ann. § 6.2-302, post-judgment interest, costs, and such other relief as the Court deems just and proper.

**COUNT II**
**QUANTUM MERUIT**
**(Alternative to COUNT I)**

47. MPA incorporates and realleges all of the foregoing allegations as if restated herein.

8

48. Plaintiff pleads this Count in the alternative to Count I in the event the Court determines that the written rate schedule and related course of performance do not constitute an enforceable express contract.

49. In that event, the parties' conduct, course of performance, dispatch and completion of reservations, BLS's acceptance of MPA's services, BLS's historical payment practices, and BLS's internal acknowledgment of amounts owed to MPA establish an implied-in-fact agreement between MPA and BLS.

50. Under the implied-in-fact agreement, MPA agreed to perform chauffeured ground transportation services for reservations dispatched by BLS, and BLS agreed to compensate MPA for each completed reservation.

51. BLS manifested its assent to the implied-in-fact agreement by dispatching reservations to MPA, identifying trip details and service requirements, accepting MPA's completed services, collecting payment or other value from its end-clients for those services, historically paying MPA for completed reservations, and recording amounts owed to MPA in BLS's own Accounts Payable Aging Detail Report.

52. MPA manifested its assent to the implied-in-fact agreement by accepting BLS-dispatched reservations, providing vehicles, drivers, fuel, insurance, dispatch coordination, and operational support, completing the assigned transportation services, and continuing to perform in accordance with the parties' established course of performance.

53. The parties' course of performance supplied the material terms of the implied-in-fact agreement, including the services MPA was to perform, the manner in which BLS dispatched reservations to MPA, BLS's obligation to compensate MPA for completed reservations, and the rates or reasonable value applicable to those services.

9

54. BLS knew or reasonably should have known, based on the parties' nearly decade-long course of performance, that MPA performed BLS-dispatched reservations with the expectation that BLS would compensate MPA for each completed reservation.

55. MPA performed the services with BLS's knowledge, authorization, and acceptance.

56. BLS accepted MPA's completed performance without objection, complaint, chargeback, or dispute regarding the quality or completion of the services.

57. BLS failed and refused to compensate MPA for completed reservations beginning in or around October 2025 and continuing through the present.

58. The compensation due to MPA, or alternatively the reasonable value of the services MPA provided, is reflected by the parties' historical course of dealing, the rates previously paid by BLS for comparable completed reservations, the written rate schedule issued by BLS, and BLS's own Accounts Payable Aging Detail Report. The compensation due is no less than $85,215.56, exclusive of amounts owed for services rendered in March 2026 and thereafter.

59. BLS's failure to compensate MPA for services knowingly requested, authorized, accepted, and historically paid for constitutes a breach of the parties' implied-in-fact agreement and entitles MPA to recover the compensation due or, alternatively, the reasonable value of the services rendered in quantum meruit.

60. As a direct and proximate result of BLS's failure to compensate MPA, MPA has suffered damages in an amount no less than $85,215.56, exclusive of additional amounts continuing to accrue, together with prejudgment interest, post-judgment interest, costs, and such other relief as the Court deems just and proper.

## COUNT III
### UNJUST ENRICHMENT
**(Alternative to COUNT I and COUNT II)**

61. MPA incorporates and realleges all of the foregoing allegations as if restated herein.

62.   Plaintiff pleads this Count in the alternative to Count I and II, in the event the Court determines that no express contract or implied-in-fact contract governs the parties' dispute.

63.   MPA conferred substantial benefits upon BLS by performing chauffeured ground transportation services for reservations BLS dispatched to MPA.

64.   The benefits MPA conferred included, among other things, providing vehicles, drivers, fuel, insurance, dispatch coordination, operational infrastructure, and completed transportation services for BLS's end-clients.

65.   BLS knew of the benefits MPA conferred because BLS dispatched the reservations to MPA, communicated trip details and service requirements to MPA, received confirmation of completed services, billed or collected from its end-clients for those services, and recorded amounts owed to MPA in its own Accounts Payable Aging Detail Report.

66.   BLS accepted and retained the benefits conferred by MPA without objection, complaint, chargeback, or dispute regarding MPA's performance.

67.   BLS received payment, revenue, business goodwill, client retention, or other value from its end-clients as a result of the transportation services MPA performed.

68.   BLS would not have been able to fulfill the reservations assigned to MPA, bill its end-clients for those reservations, or retain the associated revenue and goodwill without MPA's performance.

69.   BLS knew or reasonably should have known that MPA expected to be compensated for the services it provided.

70.   BLS knew or reasonably should have known that it would be inequitable to retain the benefits of MPA's services without paying MPA.

11

71. Despite receiving and retaining the benefits of MPA's services, BLS failed and refused to compensate MPA.

72. BLS's retention of those benefits without payment is inequitable and unjust, particularly because BLS dispatched the reservations to MPA, accepted completed performance, collected payment or other value from its end-clients, and internally recorded the amounts owed to MPA.

73. The value of the benefits MPA conferred on BLS is reflected by the parties' historical course of dealing, the rates previously paid by BLS for comparable services, the written rate schedule issued by BLS, and BLS's own Accounts Payable Aging Detail Report.

74. The value of the benefits unjustly retained by BLS is no less than $85,215.56, exclusive of amounts owed for services rendered in March 2026 and thereafter.

75. MPA is entitled to restitution and disgorgement of the value unjustly retained by BLS, together with pre-judgment interest, post-judgment interest, costs, and such other relief as the Court deems just and proper.

## COUNT IV
## ACTUAL FRAUD

76. MPA incorporates and realleges all of the foregoing allegations as if restated herein.

77. Under Virginia law, a claim for actual fraud requires: (1) a false representation; (2) of a material fact; (3) made intentionally and knowingly; (4) with intent to mislead; (5) reasonable reliance by the party misled; and (6) resulting damage. *See Prospect Development Co. v. Bershader*, 258 Va. 75, 85, (1999).

78. Beginning in or around October 2025 and continuing through March 2026, BLS, acting through its President Michael Okon and its Chief Financial Officer Kevin Hornik, made

repeated false representations of material fact to MPA regarding BLS's present intent and ability to pay MPA for completed transportation services.

79. Specifically, Mr. Okon and Mr. Hornik represented to MPA, on multiple occasions, that "money will be flowing in tomorrow," that BLS would "wire you something tomorrow to start paying down your bill," and that the "intent is to pay you and we'll get you money next week." *See* Exhibit C.

80. On March 13, 2026, Mr. Okon emailed MPA and represented: "I'm so sorry . . . We had a cash flow problem. No one is lying. The intent is to pay you and we'll get you money next week." *See* Exhibit C.

81. On or about November 24, 2025, BLS issued a check to MPA in the amount of $5,096.39, thereby representing that the check was supported by sufficient funds and was a valid instrument of payment. *See* Exhibit D.

82. After the check was returned for insufficient funds, Mr. Hornik instructed MPA to redeposit the check, thereby representing that the underlying account contained sufficient funds to honor the instrument upon resubmission. *See* Exhibit D.

83. By instructing MPA to redeposit the check, BLS represented that sufficient funds or credit existed, or would exist, to honor the check upon redeposit. No payment followed any of these assurances. The check BLS issued was not honored on first deposit, was not honored on redeposit, and remains unpaid.

84. BLS owed MPA tort duties independent of the parties' contractual Agreement.

85. BLS owed MPA an independent duty not to issue negotiable instruments on accounts BLS knew, or recklessly disregarded, lacked sufficient funds to honor the instruments.

13

86. BLS owed MPA an independent duty not to direct MPA's deposit or redeposit of negotiable instruments BLS knew or had reason to know the underlying account could not honor.

87. BLS owed MPA an independent duty not to make knowingly false affirmative representations of present material fact, including BLS's present financial condition, present intent to pay, and present ability to pay, for the purpose of inducing MPA's continued performance and forbearance from collection.

88. BLS's representations concerned existing facts, not mere predictions of future conduct. At the time BLS represented that payment would be made imminently, BLS knew that it lacked the present ability to make the promised payments within the stated timelines, lacked any reasonable basis to represent that such payments would be made, or had no present intent to make the payments when promised.

89. The BLS's representations were material because they concerned whether MPA would be paid for services already performed, whether MPA should continue performing additional reservations, whether MPA should continue extending credit to BLS, and whether MPA should immediately terminate the parties' Agreement or pursue collection.

90. BLS made the representations with the intent to induce MPA to continue performing reservations dispatched by BLS, refrain from terminating the parties' relationship, delay immediate collection efforts, and continuously incurred operating expense for the ride that BLS requested.

91. MPA reasonably relied on BLS's representations because BLS had historically paid MPA under the parties' nearly decade-long course of performance, BLS's senior officers were the persons with knowledge of BLS's financial condition and payment ability, and MPA had no independent access to BLS's internal financial information.

14

92. In reliance on BLS's representations, MPA continued performing reservations dispatched by BLS, refrained from terminating the parties' relationship earlier, and refrained from pursuing immediate collection remedies.

93. BLS's misrepresentations caused MPA damages separate and apart from the mere nonpayment of the preexisting contract balance, including damages arising from MPA's continued post-misrepresentation performance, delayed collection efforts, increased exposure to unpaid receivables, forced operational decisions, and loss of the opportunity to mitigate its damages earlier.

94. BLS's intentional misrepresentations breached those independent duties, separate and apart from any breach of the parties' contractual Agreement.

95. BLS's intentional, willful, and wanton misrepresentations caused MPA harms distinct from the unpaid contractual balance, including but not limited to the forced sale of MPA's vehicles at distressed values, the loss of MPA's commercial reputation in the affiliate transportation industry, and the destruction of MPA's operational capacity, all of which flowed from MPA's continued reliance on BLS's affirmative misrepresentations rather than from BLS's failure to pay the contract balance itself.

**COUNT V**
**CONSTRUCTIVE FRAUD**
**(In the Alternative to COUNT IV)**

96. MPA incorporates and realleges all of the foregoing allegations as if restated herein.

97. Plaintiff pleads this Count in the alternative to Count IV in the event the Court determines that BLS's misrepresentations were not made with actual knowledge of their falsity.

98. Under Virginia law, a claim for constructive fraud requires a showing that a false representation of a material fact was made innocently or negligently, and that the injured party was damaged as a result of reasonable reliance upon the misrepresentation. *Bershader*, 258 Va. at 86.

15

99. To the extent BLS's representations are found not to have been intentionally false, BLS made the representations negligently, recklessly, or without reasonable basis for believing them to be true.

100. BLS, through its senior officers, represented to MPA that payment would be made imminently, including that "money will be flowing in tomorrow," that BLS would "wire you something tomorrow to start paying down your bill," and that BLS would "get you money next week." *See* Exhibit C.

101. BLS's issuance of a $5,096.39 check to MPA and Mr. Hornik's subsequent instruction to redeposit that check were at minimum made negligently and without reasonable basis or care to verify the financial condition of the account. *See* Exhibit D.

102. The representations were material and went directly to whether MPA would be compensated for services rendered and whether MPA should continue performing additional reservations BLS continued to dispatch.

103. BLS intended for MPA to rely on these representations. MPA reasonably and justifiably relied on them, given the parties' nearly decade-long course of performance under the affiliate Agreement, BLS's consistent prior payment history under that course of performance, and MPA's lack of any independent means to verify BLS's financial condition or the status of BLS's bank accounts.

104. In reliance on BLS's representations, MPA continued to perform transportation reservations BLS dispatched, refrained from terminating the parties' Agreement, refrained from pursuing earlier collection efforts, and continuously incurred operating expense for the ride that BLS requested.

16

105.     BLS owed MPA tort duties independent of the parties' contractual Agreement.

106.     BLS owed MPA an independent duty to exercise reasonable care in issuing negotiable instruments only on accounts BLS had reasonable basis to believe contained sufficient funds.

107.     BLS owed MPA an independent duty to exercise reasonable care in directing MPA's deposit or redeposit of negotiable instruments issued by BLS.

108.     BLS owed MPA an independent duty to exercise reasonable care in making affirmative representations of present material fact, including BLS's present financial condition, present intent to pay, and present ability to pay, for the purpose of inducing MPA's continued performance and forbearance from collection.

109.     BLS's negligent misrepresentations breached those independent duties of care, separate and apart from any breach of the parties' contractual Agreement.

110.     BLS's breach caused MPA harms distinct from the unpaid contractual balance, as set forth in Count IV.

111.     As a direct and proximate result of BLS's negligent misrepresentations, MPA has suffered the same damages alleged in Count IV.

112.     These damages are independent of the unpaid contract balance and would not have been incurred, or would have been substantially mitigated, had MPA not been induced to continue performing in reliance on BLS's representations.

## COUNT VI
### VIOLATION OF VA. CODE §8.01-27.1

113.     MPA incorporates and realleges all of the foregoing allegations as if restated herein.

17

114.   On or about November 24, 2025, BLS issued a check to MPA in the amount of $5,096.39.

115.   Payment of the check was refused by the drawee depository because of lack of funds in or credit with the drawee depository.

116.   MPA is the payee and holder of the dishonored check.

117.   Pursuant to Va. Code § 8.01-27.1, in any civil action brought against the drawer of a check, draft, or order refused by the drawee depository because of lack of funds or credit, the holder is entitled to claim, in addition to the face amount of the check: legal interest from the date of the check, any protest or bad-check return fee charged to the holder by its bank or other depository, a $50 processing charge, and reasonable attorneys' fees if awarded by the Court.

118.   BLS is liable to MPA for the face amount of the dishonored check, legal interest from the date of the check, any protest or bad-check return fee charged to MPA, a $50 processing charge, and reasonable attorneys' fees if awarded by the Court.

119.   MPA's recovery under Va. Code § 8.01-27.1 is sought in addition to MPA's other claims and remedies, except that MPA does not seek a double recovery for the same unpaid amount.

WHEREFORE, Plaintiff MPA Transportation, Inc. respectfully requests that this Court enter judgment in its favor and against Defendant BLS-USA, Inc., and award the following relief:

1.   Direct damages in an amount no less than $85,215.56, exclusive of additional amounts owed for services rendered in March 2026 and thereafter;

2.   In the alternative, restitution, quantum meruit, and/or unjust-enrichment damages equal to $85,215.56, the reasonable value of the services MPA provided to BLS;

3. Consequential damages in an amount to be proven at trial, including damages arising from the forced sale of revenue-generating vehicles at distressed values, the involuntary termination of four employees, loss of operational capacity, default on Plaintiff's financial obligations, and reputational harm;

4. Statutory recovery under Va. Code § 8.01-27.1 for the dishonored check issued by BLS, including the face amount of the check, legal interest from the date of the check, any protest or bad-check return fee charged to MPA, a $50 processing charge, and reasonable attorneys' fees if awarded by the Court;

5. Pre-judgment and post-judgment interest at the applicable statutory rate, including pre-judgment interest pursuant to Va. Code § 6.2-302 where applicable;

6. Reasonable attorneys' fees and costs to the extent permitted by statute, rule, or other applicable law; and

7. Such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38.

Respectfully Submitted,
MPA TRANSPORTATION, INC.
By Counsel

_____

Lelena Mulugeta, Esq., VSB No.: 101057
Donna Zhang, Esq. VSB No.: 101748
Fox & Moghul
10509 Judicial Drive
Suite 300 Fairfax, Virginia 22030
(T): (703) 652-5506
(F): (703) 956-1813
Mulugeta@moghullaw.com
Zhang@moghullaw.com
*Counsel for Plaintiff*